Appeal. Case number 20-7017 et al, Lusik Usoyan et al versus Republic of Turkey Appellant, Mr. Schammel for the appellant, Ms. Frischmann for the appellate. Mr. Schammel, please begin before you do. I apologize to everyone. I don't know what I did, but I'm back on. So please proceed. That's wonderful. I'm sure I would have not been able to figure it out either. May it please the court. Good morning. My name is Mark Schammel. I'm here on behalf of the Appellant of the Republic of Turkey. The district court erred in its two-pronged analysis, excuse me, in its pronged two analysis of Berkowitz when it denied Turkey's motion to dismiss. The Berkowitz test is a clear analytical vehicle for a dispassionate analysis of a foreign sovereign immunity claim. The court need not engage in any factual analysis of degree or nature of force, nor should the district court do any balancing of the alleged facts as was done here. To do so is to get into the exact second guessing that Congress intentionally sought to avoid when it passed the statute and that the Supreme Court found in Gobert. 28 U.S.C. Before Mr. Erdogan, President Erdogan's car had even arrived at the residence, board even arrived at the residence, the security agents knew it was en route. One of the agents pulls out a machine gun and shoots every single protester because they fear they're terrorists or terrorist supporters and they want to make the place secure for the president. Could there be a lawsuit for that? The answer, Your Honor, is it depends. Okay, tell me why it depends on what you think there could be a lawsuit, whether there would be a discretionary function immunity in that context or not. Tell me what it depends on. What more facts do you need? Well, I think the starting point for such an analysis, Your Honor, for any district court is to determine what is the conduct. I've just described to you what the conduct is. I'm going on my hypothetical, not this case. I'd just like an answer to that hypothetical. Correct. And in that hypothetical, if it's assassination, that may be a horse of a different color. How do I know if that's assassination? I've given you the description. I've given you exactly the facts we have. Assassination will be someone's label or not. What we do know is a machine gun was taken out and all the protesters were killed. And before the car arrived. I don't think that the car's arrival is necessarily an important analysis for the court to undertake because the security function of the presidential security detail, it starts. But I'm just telling you my facts. So under my facts, the president's not even on site yet. So you say that doesn't matter, but go ahead. And under the court has to, under Berkowitz, start with the prong one analysis, which is what is the prong one answer to that? I know how to do the analysis. I'm just trying to I would like to get your answer on each prong of that analysis on prong one. What is your answer? I believe on prong one in that situation, your honor, it sounds like it's potentially a use Coggins use Coggins. I apologize. I've garbled that, but it's more likely discretionary function. It's a discretionary position. I mean, all you're doing is saying someone might argue and you're saying someone might argue that it's a violation of international law or crimes against humanity. But you would still argue that it falls within the discretionary exception? Is that function exception? Is that what you just said? Yes, your honor. I believe. And what about prong two? Well, it's susceptible to policy analysis. Once we've crossed the Rubicon on prong one, now we're into it. It has to do with national security. And this is a this is a presidential security detail acting in their presidential security capacity. Yes, it would be under prong two. It would be susceptible to policy analysis. And under the facts, as your honor has laid out, I believe it's to me like you're arguing for just absolute immunity for foreign security details. No, your honor. No, unless they if they I guess if they if they announce that they're assassinating someone, they don't get it. Is that the only exception? No, no, your honor. I don't believe that. Give me another example of when, in your view, I've heard either prong one or prong two would not be satisfied if you have a presidential security detail. And I'm going to say the president is in the area, whether he's right there or en route. And I think if the president is en route or in the area and they are, as they have been alleged in this case, acting in their role as presidential security, then the immunity is is going to be very, very hard to overcome. I would really like to know what your very, very hard exception. I'm really what I'm lost from in your in the briefing in this case is what would have been. I mean, what actions could a foreign security detail take? And I'm assuming the president is here in the area, so you wouldn't say if they did it two weeks before he arrived here in the area. He's at the White House, but getting ready to come. Is there any faction action that they could take against American civilians that would not fall within discretionary function? I think that the courts have laid out the actions that would fall outside the realm of discretionary function, things such as assassination, things that are against international law, things that have to do with espionage. Some of those would would fall outside if it was a private act. So just because one is a presidential security detail member, they are not given free reign to do anything anywhere in any context. But here, why is the lawmaker? Yeah, no one's talking about private acts, but. What's the difference between assassination and just murder of civilians? It's a it's a public policy question, and it's also a issue of. Assassination is is against international law, correct? And so murder in that context is really an extension of what plaintiffs have alleged here. Murder of innocent civilians not contrary to international law. No, well, it could be, but it really depends on the discretionary function of the actors. And so just because murder by security details. Of innocent civilians, I'm not the hypothetical is there's no provocation. And my my view on that is the murder, which would be the death of those protesters that you're referring to as innocent civilians, is just the next level of tort. That is alleged here, and that doesn't change the analysis. So suppose suppose the the facts were as they are in this case with one change. The protective detail members raped one of the protesters across the street when they crossed the street. Is that also protected by immunity? I think the answer that you're Judge Wilkins is no. And I think the reason of that is the initial threshold analysis is what's the conduct? And here the conduct is not as the court found below presidential security. There's there's no part of raping someone that is presidential security. And so as a threshold matter, it's not presidential security. So you don't have to get into the two prong analysis of Berkovits. So mowing them down with machine gun is protected by immunity, but but raping them is not. Raping them would not be. I think that's right, Judge Wilkins. I think that mowing them down by machine gun could be part of presidential security. Let me ask a question. Let me ask a question that's closer to what I think would be the facts of this case if we let it proceed. And in discovery, it is alleged that President Erdogan and we want all watched the video that there's a conversation between him and some of his guards. If he said I don't want to see these people when I come back out, do we proceed with this case? No, Judge Anderson, we do not. Because once we've determined and I would I would argue that the facts here are not very much in dispute because of those videos. Once we have determined that this is presidential security and it's discretionary, we've as the court below found, we have satisfied Berkovits problem one for presidential security, for discretionary acts. And then the second part is, is it susceptible to policy analysis? All right, let me ask you this. Does it make a difference if it was not President Erdogan who gave the order to surge, but one of the top people in the presidential security team? Judge Anderson, I do not believe it does make a difference. And the reason is internationally protected persons. There's a large sort of group of people that fall in that rubric. Obviously, the president of the sovereign nation is the top is the tip of the spear, as it were. But there was an ambassador there. There were other members of the ambassadorial staff. There are other supervisors. It all still falls within that same rubric of presidential security susceptible to discretion. And each time a question like this comes up, I have to go back, I think, to the language of 1605, a five, a which ends with regardless of whether the discretion be abused, that I have a backup question on this. And it's something I just this is my own ignorance of how this works. Is there a federal statute or regulation that defines what the scope of authority of foreign security details are when they're in the United States, as opposed to the US Secret Service? Your Honor, I'm not aware of any manual or things that would prescribe the actions of the foreign security details. In fact, I would reference plaintiff's expert analysis, what they have submitted, and what amici have submitted to the court is they don't really even claim that there is such a sort of a prescribed set of rules and regulations as it relates to United States. That's what I'm trying to figure out, right? There's certainly seems like there's rules governing the Secret Service here. And the question is, there must be something somewhere, and maybe it's just kept confidential for reasons. The Secret Service is ultimately responsible for foreign dignitaries in this United States. And then the foreign dignitaries may bring their own details. And what I'm trying to figure out is what is the relationship? If I'm walking by, and the Secret Service says, she's no threat. She's just walking by, pushing a baby carriage. The Foreign Service detail says, we think that's a threat. The Foreign Service detail has the authority to attack American civilians walking by, or do they have to? Because there's no active attack underway. Are they supposed to contact the Secret Service agent there and say, we think that person's a threat? Or can they do anything they want? There's nothing that I'm aware of, Your Honor, as it relates to sort of like, it's almost like a pro hoc vichy of Foreign Service presidential protection to the U.S. Secret Service. And the Department of State or the U.S. Secret Service that provides the security for our diplomats and our internationally protected persons, as well as assisting in the protection of other foreign nations, their internationally protected persons, there's nothing that says that you are essentially giving up your power protecting your country's president or IPP person just because we're also here. There is a code section that's referenced throughout the case below, which I think is important, which is 18 U.S.C. 112. And 18 U.S.C. 112, that is the statute that deals with the protecting of foreign dignitaries, and that's the statute- By the Secret Service. Correct. By U.S. law enforcement forces. Correct. This is what I'm trying to figure out. So could Congress pass a law that says if the vice president would feel more secure as long as there were no protesters within a quarter mile, protesting upsets, even peaceful protesters upset the vice president of the U.S. This is a hypothetical vice president, to be clear. That hypothetical vice president says, I just feel unnerved and worried whenever I hear chants from protesters, push them all back a quarter mile. Could Congress, in authorizing the work of the Secret Service, constitutionally pass a statute like that? I think the answer to that is no, and there's a couple reasons- I agree. I agree. I agree that that would violate the First Amendment. So can Congress set up a regime, or the executive branch, can either of them constitutionally set up a regime in which foreign security details can suppress speech in a way that the Secret Service cannot? Is that constitutionally permissible for either branch to allow that scheme? I think, Your Honor, that already exists, because, you know, when we're dealing with some of the cases that are relied on by plaintiffs, and we're dealing with- there's a distinction between the FTCA and the FSIA as it relates to the difference between Americans and foreign sovereigns, and I see my time has exceeded, Your Honor. Thank you. Thank you, Your Honor. I'm sorry, of course, I lost my train of thought. We were talking- the question was, if Congress cannot authorize the Secret Service to enforce security in a manner that violates, we'll say the First Amendment here, there might be other violations too, but we'll just go with the First Amendment against peaceful protesters. And then my next- and you said no, we all agreed no, we can't do that. Correct. The next question is, can either Congress, Room 112, or some other statute, or the executive branch through regulations or practices and policies, authorize foreign security details to suppress speech in a way that they themselves cannot? And I appreciate, Your Honor, restating the question for me. And I think the answer is, if they had to, but I don't believe they had to- Hang on, hang on, I don't know what you had to- that's my question. It's very straightforward. I think it's a yes or no constitutional question. So Congress cannot pass a law that provides for security in terms of violating the First Amendment. And the branch could not adopt regulations that would do- that would violate the First Amendment. And so the question is, can either Congress or executive branch allow foreign security details to take measures that violate- that would violate the First Amendment if done by the Secret Service? And the answer, Your Honor, is that Congress has already done so. Please point me to a statute where Congress says that foreign security details can violate the First Amendment. The- it said- if you give me a moment, I can, Your Honor, because what the courts have said and what the Congress has said is that because they are foreign sovereigns, they are not bound by the same restrictions to follow the United States Constitution, and in this case, D.C. law, as Americans are. And so Congress has already, with the Foreign Sovereign Immunity Act, and with COMETI and all that comes before it, they have already given foreign sovereigns, and in this case, presidential security details, the opportunity and the ability to do what they need to do even if it violates American law. So that makes- so the Foreign Sovereign Immunities Act, in your view, is that Congress can outsource constitutional violations to foreign security details? That's what it sounds like to me. No, Your Honor. I should have thought the FSIA would have to be interpreted in a way that would not violate the Constitution. I think the FSIA is subject to the Constitution, isn't it? I mean, Congress enacting the FSIA is still subject to the First Amendment? Congress is, Your Honor. Okay, all right. And the executive branch, to the extent they're implementing policies, is subject to the First Amendment? And the executive branch is, Your Honor. And- but then your answer is that Congress and the executive, because the authorized other governmental act- foreign governmental actors to violate- it just had to outsource it to foreign details, the constitutional violations. They're not authorizing it, Your Honor, but they are permitting it under foreign sovereign immunity. All right. Can I ask a question about Section 112? The district court said that it would assume without deciding that the protesters were in violation of Section 112, because Section 112 says that people- two or more people cannot congregate within 100 feet of an ambassador's residence or consular property with the intent to harass a foreign official or official guest. So the district court said that it wouldn't matter- that didn't matter that even if the protesters were in violation of that statute. Your brief, you argue that it does matter, or at least you say that the protective detail asked them to be pushed back 100 feet. They didn't, and that kind of factored into the actions that the protective detail took. So explain to me kind of what your legal position is on Section 112 and how it's supposed to help us decide this case one way or the other. Judge Wilkins, 112 I think is- is there as a guide in some ways? Metropolitan Police Department and the Uniform Secret Service from the Foreign Mission Branch that were in attendance at Sheridan Circle that day, they had a legal duty to enforce 112. They should have pushed back anyone that was within 100 feet of the- of the Turkish property or the Turkish internationally protected peoples, and so they didn't do that. And in the presidential security function, which is what the district court here found below, and plaintiffs have made clear in over 150 references in their complaints and filings, is what was happening, a presidential security function. It's just one of those things that shows how the presidential security function was being carried out to get us to the Burkevitz analysis because they, the presidential security detail for Turkey, had to do- I don't mean had in the sense that they lose discretion, but they were using their discretion to do that which MPD and United States Secret Service Uniform Division were not doing. That's how I think it ties in to the analysis. I don't think it's dispositive if they- if Secret Service and MPD had done their job, or if they don't do their job, that is somehow determinative. Can you just follow up on that? I'm sorry, Judge Wilkins? Go ahead. So your view is that they have- even if they- even if they didn't consider the protesters a threat, but they got out their tape measure and found out that they were within 100 feet, they were 90 feet away from the residents. Your position is that the fed- the foreign security detail has the legal authority to push them back the extra 10 feet. Yes. They have the authority to enforce United States law. No. It's not- They have the right to do that. Well, your honor asked if they had the authority to push them back 10 feet, and the answer to that is yes. Do they have any law enforcement authority in the United States to enforce United States law? That answer is no. Then why do they get to enforce the 100 foot line? Because they're not enforcing the 100 foot line, your honor, and that's the kind of second guessing that the district court's not permitted to engage in. What they are doing is exercising their discretionary function in part- as part of the presidential security detail, which is the bedrock of a national security interest for a foreign sovereign, and clearly subjective- excuse me, subject to- You said you're just pushing them back the 10 feet required by law. You seem to Judge Wilkins said that was important. Under your theory, it's not a 100 foot line. It's just whatever they feel like the line is needed to secure their president. That's why I was curious. You seem to be, as Judge Wilkins said, relying on that 100 foot line, but it sounds like you're not. I think the 100 foot line, your honor, is important for the- for the analysis of the starting point. What is the conduct? What are they doing? And the fact that U.S. law enforcement, Secret Service, and NPD are not doing that is one of the factors that's rightly considered as the starting point. But once you get through that, that they are presidential security, right, and you factor that in, they have a discretionary function, which the court below found. Now we're on to prong two, which is, in this case, susceptible to policy analysis. Okay, I just- I'm sorry, finish your chart. Okay, I just have, if my colleagues will permit me, one more question. As to the McAuley incident, can you please explain to me how, since the presidential limousine had long since passed, how did the security officials going up, covering her mouth, grabbing her arm, and tearing her sign up, how did that enforce security for the president? How did that make the president, Erdogan, safer? And I think the answer to that question, your honor, is that question is second guessing the discretionary function of a presidential security detail. We have to look at the McAuley incident- I'm sorry, can your security detail explain to me how that had anything to do with securing the safety of President Erdogan? If they can't even articulate it, then I don't think we're doing any second guessing. So I'd like to hear their articulation. I don't want to second guess it, I just want to hear it. I don't believe there's a necessity of articulating the reason. First of all, your honor, with all due respect, I'm not a presidential security member. I'm not trained. I've represented many in law enforcement. They're your clients here, the government of Turkey. So surely you must have asked, how is that relevant to security? Your honor, the question of relevance to security is there in the presidential security detail, there is a continuing course of conduct. There's, as the corporal Lowe found, there's the first incident, there's a second incident. Now we're over at the ambassador, at the, and that we've left the ambassador's house and we're over at the, at the embassy. Yes, you have one person, where you have one person and the presidential limousine. That's why you said, you opened this by saying sort of a private attack would not be protected. So there must have been some sense in which, if they were just acting privately. So there was much to be some sense in which they thought that was necessary to keep the president safe. Well, with all due respect, your honor, I want to make clear, I'm not saying there was anything private that was going on that day. Okay, so then, am I right in thinking the world's divided into either private or protecting President Erdogan for these purposes? I think that the world is divided into either private or part of the general job of presidential security. Yes. Tell me, then tell me how the general job of presidential security, um, how that, how that attack on Ms. McCauley was part of the job of making President Erdogan more secure, his presence here more secure. And what I, what I would start by saying, your honor, is number one, we don't second guess and have to ask that question because it's not a question about how does it make him more secure? What if it was the next day and President Erdogan was at Dulles airport? Could we second guess? I'm sorry, I didn't catch the beginning of your next day. Okay. President Erdogan is already at Dulles airport or Andrews Air Force Base, wherever he's flying out of. Okay. Would that still be part of it? We couldn't second guess whether that was part of the security details operations. So President Erdogan is in New Orleans and the presidential security details at the embassy, am I understanding correctly? No, I said he's at, President Erdogan's at the airport flying out of Washington DC. He's not to board his plane to leave Washington DC. I don't know if he flies into Andrews Air Force Base or if he goes in and out of Dulles. I don't know where he flew in and out of, wherever he's flying in and out. He's at the airport. Okay. Hasn't left DC? Hasn't boarded the plane yet? Yes. Is the attack on Ms. McCauley at the embassy still part of the security details operations that can't be second guessed? Yes. Okay. Thank you. All right. If there are no questions, we'll give you a couple of minutes in reply. Ms. Frischman. May it please the court. My name is Agnieszka Frischman. I'm presenting argument today on behalf of the plaintiffs in both the Usoyan and the Hurd cases, which have been consolidated for the purposes of appeal. Every court to consider similar facts, and it hasn't come up very often, that agents of a foreign state attack Americans on American soil has come to the same conclusion. The agents are not entitled to immunity for assaulting, bannering American citizens, just acting on their first amendment rights. Anyone who has driven down Massachusetts Avenue any day of the week in Washington DC can see these types of protests on either side of the street. This is a routine part of the fabric of the District of Columbia. There are people protesting perceived injustices at the South African embassy, at the Japanese embassy, at the British embassy. The district court, in this case, applied exactly the test that the government of Turkey asked it to apply, and it applied it correctly. It found- But you say that they didn't, the district court didn't apply it directly because you say that the first prong of Berkowitz wasn't satisfied, whereas the district court said that the first prong was satisfied, right? The district court put aside the first prong and didn't reach a result on that. She held that she wasn't going to make a determination on it and found on the second prong. So our position is that it could be upheld, the decision can be upheld on prong one or prong two or both. Let's just talk about prong one for a moment. Your position is that because the district court found that the protective detail committed assaults and assaults are a violation of district law, prong one can't be satisfied, right? Yeah, our position is that the government, the agents of the government of Turkey cannot violate local law, that they are, that is not part of their discretion. They're obviously constrained by local law and as a matter of treaty obligation and practice. So let's suppose for the sake of this question that the protesters were in violation of 112 because they were closer than 100 feet to, and they were, there were more than two of them, and they were harassing foreign official. And the protective detail pushed after requesting the U.S. law enforcement to do so and U.S. law enforcement refusing to enforce the 100 foot more than 100 feet because they consider the 100 being within 100 feet a threat. That's an assault because any unconsented touching or use of force is an assault. So is that not immune? That fails the first prong of Berkowitz? Your honor, if it's an assault, I think it does. I think also that it's clear that... Well, would that be an assault? That would have to be determined under D.C. law. If it met all of the elements of D.C. law, then... They push them back. They push them back 20, 30 feet, however many feet it takes to get them more than 100 feet away. That's an assault, right? Yes, and I think therefore, I mean, one, first, they're not entitled to enforce D.C. law. That's a matter that is up to the D.C. police and the secret service. So they would be acting outside their discretion. So under the Red Lake case, they wouldn't have immunity for that reason. Even though Congress has specified that these people shouldn't be within 100 feet, and they feel that that's not just a violation of U.S. law, but a danger, and they push them back, they could be held liable for doing so. I think that is very close to the fact pattern that this court considered in the Red Lake Indian case, where the FBI without authority tried to enforce the law on an Indian reservation, and this court held that the FBI was not entitled to immunity for that reason, because it exceeded its own authority and enforced a law where it didn't have authority to do that. And the Second Circuit decided the same thing in the CIA mail-opening case, where somebody exceeds their authority and acts to, you know... Well, this isn't just kind of enforcing laws because you feel like, you know, enforce the law. They're trying to protect the president, the head of state. They can't do that? That those cases are analogous to this? If we're talking about prong one, then I think DC criminal law does restrain the government of Turkey. That is in the restatement, it's in the foreign affairs manual, and it's clear that that's the practice of the State Department, and that foreign agents know and are told that they have to abide by local law. And it's very clear the State Department has set out in the foreign affairs manual that they will enforce criminal law, investigate, ask for waivers, and prosecute to the fullest extent of their ability. So let's suppose one of the protesters is holding a gun, a rifle, which violates local law, and the protective detail says go arrest that person and seize their gun. And they don't. And the protective detail goes over and tackles a person and takes away their gun. The person sues for assault, the protester, and he wins? I think if that protester is sued for assault, they would lose for a number of reasons. But in this case, what we have is we have the other protesters. What happened here is you had Rukin-Izik, who was walking with her child. I'm asking you my hypo. You say that protester loses. If someone with a gun is threatening an agent and the agent neutralizes them. They're not threatening, they're just holding the gun. They're holding it down by their side. And they say arrest that person and take that gun away, and the Secret Service doesn't. And they run over and they grab the person and they knock him down and they take his gun away. Those are the facts. So that person sues, and in the protective detail in Turkey, they're not immune? I think they are not immune, but they, if put on trial, would likely win on the merits. Why? I think they are not immune because they've exceeded their authority to act. But I think that. So they don't have authority to knock someone down and take a gun away from them that's under 100 feet away from their head of state? I think that is something that law enforcement here and overseas, I think happen, probably comes up all the time. And one of the consequences are that sometimes they're put on trial for excessive force. And the jury will make the determination of whether that conduct was reasonable and whether it exceeds. I think, but I don't think there is immunity if it's an assault. I think in this case, it might not be an assault. Okay. Can I ask you what if the same thing happens in Istanbul and our president visits and the local authorities do not take a gun away from a protester that is near our embassy and the Marines guarding our embassy ask the local law enforcement authorities to help and they refuse? I think it would be the exact same thing that we just discussed. And kind of one added wrinkle is that most foreign states have a blanket territorial tort exception to foreign sovereign immunity. And we haven't found one where there's a similar discretionary function. So that this question of discretionary function actually doesn't come up because the states that have a territorial tort exception to immunity don't include that. So this debate wouldn't come up, but the debate of whether I think our secret service are told that they have to obey local law. And I think if they don't, then there will be consequences. And presumably if their conduct is reasonable, the same thing would happen as with judge Wilkins. I'm not understanding your answer. What would happen to the Marines who left the embassy and with force either took guns away, knives away, whatever, what would happen to them in Turkey? In Turkey, it would depend on the Turkish law on sovereign immunity. And I'm not familiar with that law, but my understanding is almost no states include a discretionary function. So if there's a tort and if that would qualify as a tort, then they could be liable under Turkish law, but I am not an expert on Turkish law of sovereign immunity. The authority to exercise discretion has to come from somewhere. Who has to confer that discretion? Congress? Can the executive branch through regulations? What is the source of the discretion? The source of the discretion that the Turkish security detail is on. Just on the discretionary, let's start with the Federal Tort Claims Act, which makes it gets us out of this context. In the Federal Tort Claims Act, it would be the federal government. What do you mean? It can't be the executive branch because they're the ones getting sued. They can't get out of the FTCA just by passing regulations or policies that say we can violate state law, tort law, right? I'm sorry, I guess I'm not totally understanding. The whole point of discretionary function is that there's some discretion that has been conferred on government officials, right? Who has to confer that discretion? Do we look to statutes? I think you looked at statutes, regulations, and policy. Okay. What statute, regulation, or policy governs the conduct of foreign security details? What confers discretion on them? I think the outer limits of their discretion would have to be U.S. law, federal, state, and local law. Wait, so is the question whether the Turkish government has conferred this discretion on the detail to attack protesters or must it be conferred by U.S. law, congressional or executive? It must be U.S. law because it's territorial. So if they're acting in the United States, it has to be U.S. law. So I'm back to asking you the same question I asked Mr. Schimel and that is, no one has told me where, is it a statute that authorizes foreign security details to take measures against Americans when they're here? Is there an executive branch, a state department regulation, a state department policy, a state department manual that says something somewhere must say what they can do because otherwise I shouldn't think they would have authority to do anything other than ask the Secret Service to take protective measures. Well, my understanding is that under U.S. law and international law, the obligation to protect the visiting head of state rests with the United States, with the host country. So it rests with the Secret Service and the Department of State. Okay. And whether they conferred on foreign security details, what role did they allot to them in this process? There's nothing in the record that's been submitted by Turkey that indicates that they received any authorization to act in any manner. So nothing's in the record about. So there's nothing in the record here on any law that has conferred any discretion on these, the Turkish security detail. I don't believe so. And it's my understanding that under international and U.S. law, the duty to protect the visiting head of state rests with the Secret Service and under international law, it rests with the host country. Can you have a discretionary function without American law in some form conferring discretion in the first place? It's an interesting question. I suppose the answer may well be no. And there is no case, for example, that's applied the presumption to in the FSIA context. There's no way of evaluating whether or not Turkey acted in accordance with the standard operating procedures under in accordance with any regulation or in accordance with any authority that was designated either by the State Department or their own government. There's nothing in the record on that at all. Do you know if it's worked out on a case by case basis before a foreign dignitary arrives with the respective roles of their own security detail and domestic law enforcement, domestic security will be? My understanding is that it is. That's not in the record in this case, but my understanding is that that's exactly right. But didn't you go ahead? I'm sorry, but didn't you argue below both through your experts testimony and your briefing and, you know, you argue in your briefing before us that we should look at kind of the State Department manual and procedures and what that allows and doesn't allow and that that sets the boundaries for what this Turkish protective detail are allowed to do? I mean, hasn't that been your throughout this litigation? Our position has been that if you go on prong one, that it's DC state law or state law or anywhere that constrains their ability to act, that there's no ability to violate the law. And that is in the FDCA context or countless cases that hold that. And that's OK. Let's suppose I disagree with that. We're in prong two. In prong two, we've argued that the district court did what it was exactly supposed to do, that follow the instruction in Galbera to focus on the nature of the actions taken and on whether they are susceptible to policy analysis. Whereas this circuit put it in limit the nature of the actions taken rather than the status of the actors. And the district court looked at what happened, looked at the video, looked at the affidavits of arrest, the indictment and looked at the entire record. But what is the relevance of your expert testimony and all of the stuff in your briefing about State Department kind of manuals and procedures with respect to protection of, I guess, U.S. protected persons? Well, the relevance as to prong two is the court found that the objective conduct wasn't related to protecting the president. She found that they pushed through the police line, ran after the plaintiffs who were running away, shouted, I'm going to rape you and knocked women unconscious and kicked them when they were unconscious and kicked them into seizures. And she found that that objective conduct wasn't related to the presidential protection detail. I think what our experts said was the standard operating procedure for protecting a president is to take him away and not run out and attack other people, but to coalesce around the president and remove him from the danger. And that didn't happen. So our expert argued that that showed there wasn't a risk. But I think the district court's decision was grounded in the objective conduct, which is she looked at the agents of Turkey who pushed past the police line. The video is very graphic where the agents pushed past the police officers and bloodied some of their noses, ran across the street, ran at women who were running away, holding their children, shouting, I'm going to rape you as a woman ran across the street. And you can see her stroller capsized on the grass as she ran away when they were I'm going to rape you, you're a whore. So why isn't that a finding that they abused their discretion? That is a finding that that conduct is not objectively related to protecting. The discretionary function never kicks in because it cuts off at that first step, that that sort of conduct does not fall within the discretionary function at all, because it's not objectively related to protecting the president. It was an out attack on First Amendment protesters. So you never get to that. We're using using the language of Berkowitz. A second part of the second prong would be this is something that Congress never intended to shield from liability. Isn't that correct?  All right. And in fact, every court that has considered similar facts like the Hurtado case in the Ninth Circuit and the Miango case here in the District of Columbia has come out to the same result. In the Gerritsen versus Hurtado case, there was a man who was leafleting outside the Mexican embassy and the staff came out, hit him with a metal pipe and took away his leaflets. That was found not to be immune. In Miango, there was a cluster, small group of protesters that were protesting the Democratic Republic of Congo president and his security personnel beat up the protesters and beat them to a pulp. And the district court here, the District of Columbia held that conduct was not immune under prong one. And so we submit that either prong one or prong two or one or the other or both clearly show that there's no immunity in this case because the conduct was not objectively related to protecting the president. And I guess as an analogy, some of the cases that have been cited, for example, if you look at the Forestry cases, the court can look and say the controlled burn, you could abuse your discretion to control burn, that's a discretionary function. But if the Rangers had taken a gasoline can and a match and burnt down the tractor of the logging company, the court can certainly look behind the facts and say that's not a discretionary function. A controlled burn is a discretionary function, but arson is not. And that's really the same thing that happened here. Protecting the president is a discretionary function, but what happened here is like arson. It was an all-out attack on First Amendment protesters who were standing exactly where they were told to stand on the sidewalk holding their signs. And the Lacey McCauley example is a clear example of that. This was hours later, she was chanting a pro-democracy chant outside the embassy where she was told to stand. And there's a picture in the joint appendix at 550 that shows the agents with their hands over her mouth and ripping up her signs. And the district court correctly evaluated this conduct and found it wasn't rationally related to protecting the president. So with respect to the second incident, let's suppose that the district court had found or we believe that the evidence clearly shows that the protesters were in violation of section 112. What relevance does that have? I think the district court was correct that it doesn't. Why not? Why doesn't it have any relevance? It would be up to the Metropolitan Police Department to enforce 112 and determine if it applied. And it couldn't possibly apply to other plaintiffs who weren't within 100. And we have plaintiffs who weren't near, like Mrs. Rukin was running away and outside the 100-foot point. Like if the group that all knew each other, some of them were back, some of them were forward, but all of the plaintiffs were attacked and beaten. And it certainly isn't the case that they were all within 100 feet or even knew each other or coordinated. But as to the plaintiffs that were within 100 feet, you're saying that the fact that they were breaking federal law has no relevance to this analysis? Well, 112 does have a carve-out for First Amendment protests, so I don't think they were breaking federal law. If we find that they were, you're saying it doesn't matter? I think it does not impact the immunity determination. Okay. And that's because the protective detail, if they believe that the local law enforcement is not really enforcing local law, they can't take that into account at all as to how they protect their protectee. I think they certainly can. But what our expert said is that what would have happened in that case is you would have removed the protectee and that the appropriate response isn't to run across the street, hit women until they fall on the ground unconscious and keep kicking them while they're lying there or to knock people's teeth out as they're lying on the ground and chase people across the street and shout obscenities at them while they're running away with their children. That there are certainly steps you could take within the law if you thought the assault on people who are standing exactly where the police told them to stand. And that's important to remember in this case. The plaintiffs were told to stand on the sidewalk by the MPD and that's where they stood. The second incident, there's no question that Erdogan was inside at that point, right? I believe he arrived at his car before it started and then came out of his car and walked into the residence. Okay, but the second one where the surge came from the protective detail across the street, he was, you can't tell from the film, but he was nowhere outside. He'd left the car, or maybe we don't know, maybe he was still, but you had those gates and you had the fence. In other words, I'm just trying to figure out there was no way the protective detail could say he was in danger, imminent danger, or any kind of danger for that matter. Well, that's what the district court concluded and I think that's what the video shows. The timestamps, I'm not sure match up quite exactly, but what seems like happened is he arrived, he was in the car, the incident started while he was in the car, he got out of the car and he walked into the residence. Right, that's why I think there's a good likelihood he said, I don't want to see him when I come out. Okay, are there any more questions? No. Okay. Thank you. All right, let's see. Mr. Schammel, why don't you take two minutes? Thank you very much, Your Honor. I'd just like to make a couple of points, if I may, in response to arguments by Atelier Council. One statement was made, which is that there's in the record submitted by Turkey, and I just would like to reiterate the burden is on the plaintiff, not on Turkey. There was a misrepresentation of the law underneath, which is that somehow foreign nationals are constrained by United States law. MacArthur says otherwise, and I think there is a clear sort of meshing in plaintiff's arguments between the FTCA and the reservation, CIA. Those are all American actors. They are different than a foreign sovereign. It is different. The FTCA and the Plaintiff's Council refers to Atelier, which goes from that 1970s case in Hawaii, all talk about Americans. That's the FTCA. It's different. It's not the greater authority, whether it's to enforce D.C.'s or enforce the statutes, the federal statutes hundred-foot rule, or to allow a greater sort of curtain of protection around the foreign leader than the Secret Service, for example. Not at all, Your Honor. Is discretion greater than what the Secret Service has, or is it the same? What is my comparator? The discretion is greater, but the authority, it's not a question of authority, Your Honor. They don't have authority. They have immunity, and so what the court found below, which I think is- To have a discretionary, who conferred, can you just tell me who conferred or what conferred discretion on the Turkish security detail to operate on Americans as opposed to simply securing the president by not coming, by driving away, by rushing him in? What conferred authority on them to operate on American civilians in a way that the Secret Service could not? I see I'm over my time, Your Honor. May I please respond? Of course, yes. Thank you. The authority, it comes from the common law, the international law about the relations between sovereigns and its immunity, and so- But immunity doesn't mean you're immune from the law. It means you're immune from the courts, okay? You're immune from the courts. If the State Department said, after viewing this video, get those people out of here and they may never return, they could do that, right? Yes, ma'am. And you would have to comply, Turkey would have to comply with that, correct? Yes, Your Honor. Okay, and so it's not as though that Turkey has a legally conferred by Congress or executive branch right to, say, commit violations of criminal laws in this country. It's simply that they won't be hailed into our courts, correct? That's what the immunity is. Civil courts, Your Honor. I think the criminal court is an entirely different analysis, and what would happen here- Okay, but I'm saying it's a right not to be hailed into our court. It doesn't mean the United States government couldn't demand reparations. It doesn't mean the United States government itself couldn't impose some sort of sanction or punishment or consequence, correct? Correct, that's exactly- Okay, so you're not immune from the law, you're immune from the courts, okay? Correct. So I'm having trouble understanding how the Foreign Sovereign Immunities Act is a source of law conferring legal discretion on the Turkish security detail to act on American civilians. I don't believe that it is a source of law allowing them to act on American civilians. What does? What gives them this discretion? What is the source of their discretion? The source of their discretion is the immunity that's conferred on them by statutes. Immunity is a consequence. It's what happens- Unless you're telling me that there's a statute of regulation that says, do what you want, you have immunity, which is not what the FSIA says. It just says you can't be hailed into our courts. So what is it? Is there something international? I just, I'm really quite confused by this question. Right, and I think, Your Honor, it goes to the discussion that the court was having with the police during their opportunity to discuss the case with you. What happens to Americans, it's international law. It's comedy. It's the discretion between nations. Your Honor has very accurately identified the other avenues that are available to plaintiffs to avail themselves. Can you point me to an international law statute cases recognizing the authority of foreign security details, not to just secure their person by driving away, by not coming at all if there's a security risk, by rushing him into the building, but instead to reach out and attack local civilians, maybe for good reasons, maybe for bad reasons. And in that scenario, I would refer, Your Honor, to two things, the statute that we've been discussing and the Berkovits test. Which statute? Okay, the Berkovits is simply a test for immunity from court. It's not a source of discretion. The discretion always comes from some other positive source of law. There's something else that confers discretion on our federal agencies to act. They have their organic statutes. That's what we do under the FTCA. And so what was the first statute you've been talking about? Is that one? 28. I'm sorry. Is that? Go ahead. Sorry. And I'm sorry, Your Honor. It may be on my end. Some of the words I'm missing, Your Honor, said the statute I'm referring to is the original statute we were discussing, 28 U.S.C. 1605, which talks about how you make the determination. Because there's no, I'm not aware of, and I'd be happy to brief. We're back to saying the Foreign Sovereign Immunities Act is the source of positive law for not, no, it's just, I get your argument that if you meet discretionary function, what that statute says is you can't be held into our courts, at least civilly. I understand that. Okay. I'm just, I'm not aware of any, I'd always thought there was some source of positive law that conferred discretion on governmental actors that we could look to. So we would know what the scope of the security detail or security details generally authority is in the United States. And what I'd ask the court is perhaps that's something that we could do further briefing on. My sense is it has to do with the treaties that go between nations for the international, the protection of internationally protected people or internationally protected persons. So that's why I was referring us to the discussion Your Honor was having earlier about Judge Henderson's example of what happens to the Marines that rush out of the embassy to protect an American president in Istanbul, right? That's where that discretion comes from. We go to Istanbul, we Americans go to Istanbul and our president and our secret service and our Marines, they're given discretion to protect our president. And so when the president of another nation like Turkey comes here, we involve them. Is it true that the Marines can leave the embassy grounds? They're a military force. I thought if they left embassy grounds without authorization, they would be invading the other country. I'm not talking about the Marines at the embassy. I only mentioned the Marines, Your Honor, because I think that was in Judge Henderson's- Right, but I think I wouldn't assume lightly that our Marines can leave their location and go into the territory of a foreign country to attack people. I thought Benghazi when the locals were either nowhere around or completely failed to help. The answer is I don't know that, Your Honor, as a relationship. But to keep it more sort of in line with where we are with presidential security, if our presidential security, United States Secret Service or United States Department of State, which are tasked in many of the same regards as the Secret Service, were to rush out of our embassy or the that discretion for their actions enable them to have the immunity that Turkey has here in this case. But Your Honor is absolutely correct that if there was a Turkish national who claimed that they were hurt in that or that they had been injured in some way and they had suffered a tort, there would be an opportunity for them, as Your Honor points out, through bilateral negotiations between countries, through other means. It's not in the civil courts. No, but it sounded like you said earlier. I'm sorry, this is my last question. But it sounded like you said earlier that, and this would make perfect sense to me, that before a foreign dignitary arrives, there's negotiations between the United States government and the foreign government on what kind of security and security deal they bring with them and what their role is. But no one has put that in what was arranged in advance in this case. No one's put that into the record. And it seems to me that would be the likely source, would define sort of the meats and bounds of what the discretion is that the foreign security detail had, but that hasn't been put into the record. I think in this record, Your Honor, I'd like to cite, if I may, to the joint appendix. The district court found, had the facts of these cases – What page on the joint appendix? It is JA455, Your Honor. Had the facts of these cases differed slightly, the court's decision as to defend Turkey's sovereign immunity may have differed as well. The Turkish security forces had the discretion to protect their president. And the court was correct in its initial threshold matter. It was correct in its Berkovits prong one analysis. And it was mostly there on the prong two analysis. The problem is by the court erred by adding in this sort of violent acts or degree situation where the court went on to say, the Turkish – and this is JA455 – the Turkish security forces had the discretion to protect their president, but they only had the discretion to err to some degree. And that absolutely captures the problem below with the district court, which is the district court is entering into exactly the type of second guessing that Gabbard said they cannot do. District courts – there are 700 of them across the country – each district court cannot engage in an analysis of what is the – is it discretion or not? Because the reality is – I don't know why I started talking louder. I apologize. The reality is that when we start down that road, we are springing international relations to a screeching halt. There is nothing more susceptible to policy analysis in national security. There's nothing more important in a single sort of point to national security than the head of state and the protection of that head of state and what that means in international relations. And so the problem becomes Congress allows an abuse of discretion to be tolerated, but the district court erred and they thought it was just too much. And that's not what the statute says. The discretionary function, regardless of whether discretion be used, that's the end of the analysis. All right. Do you have any more questions, Judge Millett? No, thank you. All right, Judge Wilkins? No. All right. Well, thank you, counsel, both, and your case is submitted.
judges: Henderson, Millett, Wilkins